IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRIDGET D. D.,[1]

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Civil No. 19-cv-103-DGW[2]

**MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for DIB in January 2015, alleging a disability onset date of November 27, 2013. After holding an evidentiary hearing, an ALJ denied the application on December 27, 2017. (Tr. 13-35). The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

**Issues Raised by Plaintiff**

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 19.

1

Plaintiff raises the following issues:

1. The ALJ erred in assessing her testimony.

2. The ALJ's evaluation of the medical evidence was insufficient because he did not explain why it did not support her claim and mischaracterized the evidence by saying that her mental exams were largely normal.

3. The ALJ should have found that bipolar disease was a severe impairment at step 2.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the

Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He

determined that plaintiff had not worked at the level of substantial gainful activity since November 27, 2013 and she was insured for DIB through December 31, 2018. The ALJ found that plaintiff had severe impairments of left knee degenerative joint disease; left knee meniscus tear, surgically repaired in May 2015; right shoulder impingement syndrome; obstructive sleep apnea; diabetes; obesity; major depressive disorder; panic disorder without agoraphobia; and personality disorder.

The ALJ found that plaintiff had the RFC to do light work with physical and mental limitations. Plaintiff's arguments focus on her mental impairments. The ALJ assessed mental limitations as follows:

> The claimant can perform the basic mental demands of unskilled work where she has limited interpersonal contact. On a sustained basis, the claimant can understand, remember and carry out simple instructions. She can occasionally interact with supervisors, coworkers, and the public.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work. However, she was not disabled because she was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1967 and was 50 years old on the date of the ALJ's

decision. (Tr. 220). She said she was disabled because of a number of physical and mental conditions, including bipolar disorder, depression, poor memory and concentration, and uncontrollable anger outbursts. She was 5' 9" tall and weighed 301 pounds. She stopped working in November 2013. She had worked as an Illinois state correctional officer from 1995 through 2013. (Tr. 201-203).

2.  **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in August 2017. (Tr. 42).

Plaintiff last worked as a correctional officer at a juvenile detention facility in Harrisburg, Illinois. (Tr. 46).

Plaintiff had been diagnosed with bipolar disorder. She said she had both manic and depressed cycles. She was mostly depressed but became manic if she was around people. She had racing thoughts and could not concentrate. She had anxiety and panic attacks. When she was depressed, she did not want to do anything and did not care about living. She had anger issues. (Tr. 48-50).

On a typical day, plaintiff tried to make herself something to eat and, if she was not depressed, she tried to do stuff around the house. She rarely hung out with friends because her friends drank, and she could not drink because of her medications. (Tr. 59-60).

A vocational expert (VE) also testified. The VE testified that a person with plaintiff's RFC assessment could not do plaintiff's past work, but she could do other jobs such as bench assembler, nut and bolt assembler, and routing clerk. (Tr. 62-65).

5

### 3. Relevant Medical Records

In October 2013, plaintiff told her psychiatrist, Dr. Qureshi, that she felt discriminated against at work and a co-worker had asked her "negatively" if she was a lesbian. The findings on mental status exam (appearance, behavior/attitude, motor activity, speech, affect/mood, psychotic features, cognitive functioning, and insight) were normal. Dr. Qureshi changed her medications. (Tr. 936-938). Two weeks later, she reported that she had dropped an antibiotic pill at work and feared she would be disciplined. She said she felt racially discriminated against. Mental status exam was again normal. (Tr. 940-942).

In late November 2013, plaintiff was admitted to the hospital with suicidal ideation. She was seen Dr. Qureshi, who noted she had a long history of psychiatric illness. Her same-sex partner had recently left her, and she felt stress because her mother did not accept the relationship. She was also stressed about changes at work. She was maintained on the medications that she had been taking, including Ambien, Depakote, and Valium. She was discharged in improved condition four days later with diagnoses of major depressive disorder, rule out bipolar disorder; panic disorder; and personality disorder. (Tr. 333-337).

Plaintiff received ongoing mental healthcare from Dr. Qureshi at Southern Illinois Psychiatry. She also saw Sallie Schramm at that office for individual therapy.

In December 2013, Dr. Qureshi saw plaintiff with her mother. She and her mother argued about "her life issues and her relationships." Mental status exam

6

was again normal. (Tr. 944-946).

Dr. Qureshi saw plaintiff regularly throughout 2014. His findings on mental status exam were normal. (Tr. 944-969). She tested positive for cocaine in September and was remorseful. (Tr. 961).

In January 2015, she reported becoming irritable and angry. The doctor noted that she had recently tested positive for cocaine. She denied use of drugs since then. (Tr. 639). Her mood was depressed in April. (Tr. 975). In August, her mood was depressed, and she was unable to stay focused. He prescribed Lithium. (Tr. 1004-1008, 1021-1022). In October, plaintiff told Dr. Qureshi she was feeling a lot better since she had started on Lithium. Mental status exam was normal except for depressed mood. (Tr. 1045-1048).

Ms. Schramm saw her about once a week for therapy. Her records begin in November 2014. The records from that time until March 2015 are at Tr. 614-658. Her notes of mental status exams record her observations about plaintiff's appearance, motor activity, speech, affect/mood, psychotic features, attention or cognitive functioning, and insight. Ms. Schramm consistently recorded that plaintiff was well groomed, motor activity was normal, speech was normal in volume and tone, affect/mood was full, she showed no psychotic features, and insight was fair. She also consistently reported that plaintiff's cognitive functioning was normal, and she noted no deficits in attention or maintaining focus. There were occasional notes of positive findings, i.e., labile affect/mood (Tr. 620, 640, 647, 652), irritable affect/mood (Tr. 629, 648), angry affect/mood (Tr. 656,), a "bit" of hyperactivity and somewhat loud speech (Tr. 643), loud speech (Tr. 654),

and preoccupation (Tr. 647),

In January 2015, plaintiff told Ms. Schramm that she was more active and was cooking for herself and cleaning since starting on new medication prescribed by Qureshi. (Tr. 643).

Ms. Schramm's notes pick up again in August 2015. On August 11, she noted normal findings on mental status exam. (Tr. 1008-1009). In September, plaintiff was started on Lithium. Mental status exam was normal. (Tr. 1025). In October, she talked about her activities, bingo, a birthday party, and taking her dog to a dog park. (Tr. 1043). Ms. Schramm noted she was becoming more social. (Tr. 1049). In November, plaintiff told Ms. Schramm that she had realized her mood swings were related to her diabetes and that she needed to manage her blood sugars better. (Tr. 1061). With very few exceptions Ms. Schramm noted normal findings on mental status exam throughout 2015. (Tr. 1008-1075).

The pattern continued in 2016. Plaintiff continued to see Ms. Schramm about once a week. (Tr. 1076-1093, 1098-1109, 1115-1167, 1173-1232). In February, Ms. Schramm and plaintiff discussed her perception of herself as a person who "does not go around people," but she took her dog to the dog park where she socialized, regularly attended NAMI meetings, and was on an organizing committee for mental health week. (Tr. 1085). In March, she was stepping out of her comfort zone and becoming more social. (Tr. 1092). It is true that Ms. Schramm noted some positive findings such as labile mood, sullenness, agitation or anger on a few visits. (Tr. 1118, 1120, 1124, 1142, 1149, 1166, 1175). Ms. Schramm noted increased depression in September, and she asked Dr. Qureshi for

8

an early appointment to discuss medication changes. (Tr. 1149). At the next appointment, mental status exam was normal except for hyperactive behavior; Ms. Schramm and plaintiff discussed her "dip into depression and reaching out to a friend for support." (Tr. 1158). In October, plaintiff said she had pawned some things for money to buy marijuana. (Tr. 1180). In December, plaintiff tried to avoid answering questions about alcohol and drug use, but she admitted to using marijuana in the past week. (Tr. 1216). In December, Ms. Schramm wrote that "Overall, patient is doing well."

Plaintiff saw Dr. Qureshi as originally scheduled in October 2016. (Tr. 1168-1172). He had noted normal findings on exams in March and June 2016. (Tr. 1094-1096, 1110-1113). At the October visit, plaintiff said she was "doing good." Exam was normal except that she was easily distracted. Both plaintiff and her mother said they felt her medications were helping her. Dr. Qureshi did not change her medications.

Plaintiff continued to have weekly therapy sessions with Ms. Schramm in 2017. (Tr. 1233-1244, 1250-1289). In February, plaintiff had completely cleaned her house, was building relationships with a couple of women, and was back studying the bible. (Tr. 1253). In March, she admitted to using drugs and alcohol while visiting her cousin. (Tr. 1261). Later in March, plaintiff was upset because she had given money to woman in Chicago that she met on a dating site. (Tr. 1269). At the next visit, her mood had stabilized, and she was focused on her activities of remodeling her house and the NCAA tournament. (Tr. 1273). She started monthly Invega injections. Her mood was improved, and she was calmer.

(Tr. 1277). Plaintiff appeared for a session in April under the influence of marijuana. She admitted that she and her mother and sister "get into it" over the cost of marijuana and the interaction with her psychiatric drugs. (Tr. 1286-1289).

Dr. Qureshi noted normal findings on mental exam in February 2017. Plaintiff said her cousin had good results on Invega shots and she wanted to try it. Dr. Qureshi wrote a prescription to initiate prior authorization. (Tr. 1245-1249). On April 28, 2017, she was anxious, angry, hostile, and tearful. She admitted to smoking marijuana which she said helped her anxiety. Dr. Qureshi instructed her mother to take her to the emergency room. (Tr. 1290-1294).

Plaintiff was admitted to the hospital on April 29, 2017, for depression and suicidal ideation. She had been using marijuana two to three times a day for her anxiety. Dr. Qureshi treated her in the hospital. He changed her from Xanax to Valium for anxiety and increased the dosage of Invega. She was also started on Effexor for depression. She responded "very well" to medications and was discharged on May 3, 2017. (Tr. 1306-1316).

Plaintiff saw Ms. Schramm on May 9, 2017. Mental status exam was normal except for limited judgment. She said she was not using marijuana. (Tr. 1295-1299). The next day, Dr. Qureshi saw her and noted normal findings on mental status exam. (Tr. 1300-1304).

Ms. Schramm continued to see plaintiff weekly through July 2017. (Tr. -1377). Mental status exams were generally normal except for anger (Tr. 1361) and limited judgment (Tr. 1351). In mid-June, she was living in a motel because her trailer home had been damaged in a fire. (Tr. 1357). In late June, plaintiff

admitted that she had smoked marijuana that morning. (Tr. 1347).

Ms. Schramm noted normal mental status exams on July 5, 11, and 18, 2017. Plaintiff was continuing to smoke marijuana. (Tr. 1328-1342).

The last medical record is dated July 26, 2017. Plaintiff complained to Dr. Qureshi of increased anxiety. She was unable to stay focused and was easily distracted on exam. Dr. Qureshi increased the dosage of Valium. (Tr. 1322-1327).

## Analysis

Plaintiff first argues that the ALJ erred in assessing the reliability of her subjective allegations.

SSR 16-3p, effective as of March 28, 2016, supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. 2017 WL 5180304, at *1. SSR 16-3p requires the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529; it eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." 2017 WL 5180304, at *10. It does not purport to change the standard for evaluating the claimant's allegations regarding her symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than

credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

As required by § 404.1529 and SSR 16-3p, the ALJ considered the objective medical evidence; the course of treatment; the findings of the healthcare providers on mental exams; plaintiff's own statements to her treaters; her daily activities; and the medical opinions.

Plaintiff's only criticism is that the ALJ did not explicitly discuss her hearing testimony. She cites a district court case in support of her argument that this constitutes reversible error. See, Doc. 24, p. 6. However, district court decisions are not authoritative precedent. *Van Straaten v. Shell Oil*, 678 F.3d 486, 490 (7th Cir. 2012).

Plaintiff's argument ignores the ALJ's analysis. He considered her written reports, a statement submitted by her relative, the medical records, and the statements made by plaintiff to her healthcare providers. It is true that the ALJ did not repeat her hearing testimony in his decision, but there is no hard and fast requirement that he do so. Tellingly, plaintiff does not even attempt to demonstrate that plaintiff's hearing testimony is consistent with any of the other evidence. It is apparent that her testimony conflicts with the statements she made to Dr. Qureshi and Ms. Schramm, and with their repeated observations of normal mental status exams. The ALJ's conclusion as to the accuracy of plaintiff's statements was supported by the evidence and was not "patently wrong;" it must

therefore be upheld. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

For her second point, plaintiff challenges the ALJ's consideration of the records from Southern Illinois Psychiatry. She first argues that the ALJ summarized but did not analyze the records. She then argues that the ALJ mischaracterized the medical evidence by describing the mental status examinations as relatively normal.

Plaintiff concedes that the ALJ "thoroughly recites the claimant's medical treating history." Doc. 24, p. 7. Her argument that the ALJ failed to analyze the records is refuted by the discussion at Tr. 31. There, the ALJ explained that "the notes consist primarily of subjectively reported symptoms, and mental status examinations are relatively normal throughout the record." He pointed out that the notes reflect her own statements that she was increasing her social activity. Her first hospitalization was related to her break-up with her partner. He concluded that the records suggest that much of plaintiff's depression and agitation was related to her inability to return to her job. That discussion constitutes an analysis of the medical records.

Plaintiff's quarrel with the characterization of the mental status exams is disingenuous at best. She asserts that "a reviewing court is left to wonder what mental status examinations were considered to be normal or what part of the mental status examination were normal because the ALJ fails to specifically state what mental status examinations he was referring to." Doc. 24, p. 9. This is a false statement. The ALJ described the mental status exam findings in detail and identified the mental status exams by dates and exhibit numbers in his discussion

of the medical evidence. See, Tr. 18-30. Plaintiff also argues that "that if any part of a mental status examination is abnormal, it cannot be characterized as mostly normal." Doc.24, p. 9. She offers no support for that assertion.

Lastly, plaintiff argues that the ALJ erred in not identifying bipolar disorder as a severe impairment at step 2. The failure to designate bipolar disorder as a severe impairment, by itself, is not an error requiring remand. At step 2 of the sequential analysis, the ALJ must determine whether the claimant has one or more severe impairments. This is only a "threshold issue," and, as long as the ALJ finds at least one severe impairment, he must continue on with the analysis. And, at step 4, he must consider the combined effect of all impairments, severe and non-severe. Therefore, a failure to designate a particular impairment as "severe" at step 2 does not matter to the outcome of the case as long as the ALJ finds that the claimant has at least one severe impairment. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), citing *Castile v. Astrue*, 617 F.3d 923, 927-928 (7th Cir. 2010).

Plaintiff concedes that the step 2 determination is only a "de minimus screening for groundless claims." Doc. 24, p. 10. The ALJ did designate severe mental impairments and assessed mental limitations. Plaintiff does not identify any specific limitation caused by bipolar disorder that is not accounted for in the RFC assessment. It is difficult to see how the failure to identify bipolar disorder as a severe impairment prejudiced plaintiff in these circumstances.

Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified a sufficient reason to overturn the ALJ's conclusion. Even if reasonable minds could differ as to whether plaintiff

14

was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

### Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:** November 22, 2019.

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**